## *In re* AH LEE.

### *(District Court, D. Oregon.* April 19, 1880.)

**1.** IMPRISONMENT.

The national courts have jurisdiction to relieve any person from imprisonment under color of the authority of a state, without due process of law, contrary to the fourteenth amendment.

**2.** DUE PROCESS OF LAW.

A person imprisoned under a valid law, although there is error in the proceeding resulting in the commitment, is not imprisoned without due process of law, contrary to the fourteenth amendment.

**3.** DE FACTO OFFICER.

A person in office by color of right is an officer *de facto*, and his acts as such are valid and binding as to third persons; and an unconstitutional act is sufficient to give such color to an appointment to office thereunder.

**4.** SAME.

The constitution of Oregon authorizes the legislature, when the population of the state equals 200,000, to provide by *election* for separate judges of the supreme and circuit courts. On October 17, 1878, the legislature passed an act providing for the election of such judges at the general election in June, 1880, and also that the governor should appoint such judges in the meantime, which was done. *Held*, that admitting such act was unconstitutional, because the population of the state was less than 200,000, and that the appointments by the governor were therefore invalid, and also because the constitution only authorized the selection of such judges by *election*, still the persons so appointed under the act, and performing the duties of the judges of said courts, were judges *de facto*, and a person imprisoned under a judgment given in one of them, convicting him of a crime, is not thereby deprived of his liberty without due process of law, contrary to the fourteenth amendment.

*Habeas Corpus.*

*Rufus Mallory* and *John W. Whalley*, for petitioner.

DEADY, D. J. This is a petition for a writ of *habeas corpus* directed to the sheriff of this county commanding him to produce the body of the petitioner, Ah Lee, before this court, together with the cause of his detention. Substantially the petition states that the petitioner is a citizen of the empire of China; that he has been indicted and convicted of the crime of murder in the circuit court for the county of Multnomah and state of Oregon, alleged to have been committed in the killing of one Chung Su Ging about October 3, 1878, in a joss house in this city, the judgment of which court was afterwards affirmed by the supreme court of the state; that afterwards said circuit court, in pursuance of a mandate from said supreme court, appointed April 20, 1880, as the day on which the judgment aforesaid should be executed by hanging the petitioner; that neither the person who acted as judge of said circuit court during the pendency of said proceeding, nor those who acted as judges of said supreme court during the same, were ever appointed or elected judges of said courts, or any of them, in pursuance of any law or authority of the state of Oregon; that neither they, nor any of them, had any power or authority to act as such judges during the pendency of said proceeding, or at all, and that therefore said proceeding and the judgment therein were carried on and had without due process of law, within the meaning of article 14 of the amendments of the constitution of the United States, and are therefore void and of no effect; that the sheriff of said county now unlawfully restrains the petitioner of his liberty in pursuance of said void and pretended judgment, and also threatens and intends to deprive him of his life, as therein provided and directed. Besides these allegations contained in the petition, it was assumed and understood upon the argument that the following facts were judicially known to the court: That on October 17, 1878, the legislature of this state passed an act entitled "An act to provide for the election of supreme and circuit judges in distinct classes," (Sess. Laws 1878, p. 33,) by which it was provided that at the general election in June, 1880, there should be elected three jus-

tices of the supreme court, who should take office on the first Monday in July thereafter; and also a circuit judge in each of the judicial districts of the state, who should take office at the same date. By section 10 of the act it was further provided that, "within 20 days after the taking effect of this act, the governor shall appoint three judges of the supreme court and five judges of the circuit courts, who shall, within 10 days after receiving notice of their appointments, qualify and enter upon the duties of their offices until their successors are elected and qualified, as provided in this act;" that the governor appointed certain persons to be judges of the supreme and circuit courts accordingly, who entered upon these respective offices and thereby displaced the five justices of the supreme and circuit courts then in office; and that each of the judges before whom the action against the petitioner was heard and tried, entered and held office under and by virtue of an appointment under said section 10, and not otherwise; and the contention of the petitioner is that this act is unconstitutional, and the appointments thereunder illegal and void, and therefore the petitioner is in custody without due process of law.

The petition is based upon the clause of section 1 of the fourteenth amendment which reads: "Nor shall any state deprive any person of life, liberty, or property *without due process of law*;" and sections 751–755 of the Revised Statutes, which provide for the issuing of the writ of *habeas corpus* by the courts and judges of the United States. The 753d section of the Revised Statutes provides that, among other cases, the writ may "extend to a prisoner" who "*is in custody in violation of the constitution, or of a law or treaty of the United States,*" whether under color of the authority of the United States or a state thereof. This amendment, like the original constitution, is the *supreme* law of the land, and therefore, within the limit of its operation, the national government is superior to that of the state. Section 5 of the amendment gives congress express power to enforce the provisions thereof. In relation to the limitation upon the power of the state to "deprive any person of life, liberty, or property,"

congress has exercised this power in the passage of the act
of February 5, 1867, (14 St. 385; Rev. St. § 753,) which
authorizes the national courts to inquire, by *habeas corpus*
into the cause of detention of any one who "is in custody,"
whether under the authority of the state or otherwise, "in
violation of the constitution, or a law or treaty of the United
States," and to discharge him therefrom in case he is held in
contravention thereof. If, then, the petitioner is restrained of
his liberty or adjudged to lose his life by the act or agency
of the state, without due process of law, he is so restrained or
adjudged in violation of the constitution of the United States,
and therefore this court has power, and it is its duty, to inter-
fere and relieve him from such restraint or adjudication.

Argument cannot make the case plainer than the mere state-
ment of it. The conclusion necessarily follows from the pre-
mise. The state can only act through individuals, and when it
does so their acts are the acts of the state. As was said by
Mr. Justice Strong, in delivering the opinion of the court in
*Ex parte Coles*, at the present term of the supreme court:
"We have said that the prohibitions of the fourteenth amend-
ment are addressed to the states. They are: ' No state shall
make or enforce any law which shall abridge the privileges
or immunities of citizens of the United States; nor shall any
state deprive any person of life, liberty, or property without
due process of law, nor deny to any person within its juris-
diction the equal protection of the laws.' They have reference
to the actions of the political body denominated a state, by
whatever instruments or in whatever modes that action may
be taken. A state acts by its legislature, its executive, or its
judicial authorities. It can act in no other way. The con-
stitutional provision, therefore, must mean that no agency of
the state, or of the officers or agents by whom its powers are
exercised, shall deny to any person within its jurisdiction the
equal protection of the laws. Whoever by virtue of public
position under a state government deprives another of prop-
erty, life, or liberty, without due process of law, or denies or
takes away the equal protection of the laws, *violates the con-
stitutional inhibition,* and as he acts in the name and for the

state, and is clothed with the state's power, his act is that of the state. This must be so or the constitutional prohibition has no meaning, when the state has clothed one of its agents with power to annul or evade it."

And again, in speaking of the power of congress to enforce these prohibitions, and the supposed want of it in regard to the injunctions addressed to the states in the original constitution, as was said in *Kentucky* v. *Dennison*, 24 How. 66, he says: "But the constitution now expressly gives authority for congressional interference and compulsion in the cases embraced within the fourteenth amendment. It is but a limited authority, true, extending only to a single class of cases, but within its limits it is complete." *In re Parrott*, U. S. C. C. Dist. of Cal., *Sawyer* and *Hoffman*, JJ.,[*] lately held that the constitution and laws of California, forbidding the employment of Chinese by corporations, was a denial by the state of the equal protection of the laws to the Chinese, and therefore void, and took Parrott upon a *habeas corpus* out of the hands of the state authorities, where he was held upon a criminal charge for violating these laws, and discharged him, as being in custody contrary to the constitution of the United States.

It is admitted that the state has the power to deprive persons of life, liberty, and property, provided it is not done without due process of law. The power to do this, so far as it ever existed, is denied to and in effect taken away from the state by the fourteenth amendment. And this is not all. In case the state does so deprive any one, or attempts to, power is conferred upon the general government to interfere and prevent or correct the wrong. It is worse than idle to talk about the right of a state to do what the constitution prohibits it from doing, or the want of right in the United States to do what the constitution expressly authorizes it to do. The constitution, and not the local convenience, passion, or interest, is the standard and measure of the relative right and power of a state and the United States in our form of government. This fourteenth amendment was made a part of the constitution by the ratification of the states, including Oregon, and

[*]Reported in 1 FED. REP. 481.

its provisions are as much the supreme law of the land as any line or word in the original instrument.

The clause now under consideration only forbids a state to act towards individuals in disregard of what are generally deemed fundamental principles. So far, then, it is a bulwark against local tyranny and opression, and therefore ought to be considered and enforced as a provision intended and calculated to maintain and promote right and justice between the state and its inhabitants.

Article 7 of the constitution of the state provides substantially as follows: The judicial power shall be vested in a supreme, circuit, and county courts. Section 1. The supreme court shall consist of four justices, "to be chosen in districts by the electors thereof," but the number may be increased to seven. Section 2. Vacancies in this office must be filled by election, but the governor may fill a vacancy until the next election. Section 4. The supreme court shall have only appellate jurisdiction, and shall hold a term at the seat of government annually. Sections 6, 7. The circuit court shall be held in each county by one of the justices of the supreme court, and shall have all judicial power not otherwise vested. Sections 8, 9. Section 10 provides: "When the white population of the state shall amount to 200,000, the legislative assembly may provide for *the election* of supreme and circuit judges in distinct classes, one of which classes shall consist of three justices of the supreme court, who shall not perform circuit duty, and the other shall consist of the necessary number of circuit judges, who shall hold full terms without allotment, and who shall take the same oath as the supreme judges."

The petitioner claims that the act under which the persons who were appointed judges of the court in which his case was tried and heard was unconstitutional and void, because: (1) The act does not declare or find that there was 200,000 population in the state when it was passed, nor was there any census, election return, or other record or public writing, or record tending to establish that fact, but the contrary; (2) that the provision of the constitution authorizing the legisla-

ture to provide for distinct judges for the supreme and circuit courts authorized it to do so by *election,* but not *appointment,* and therefore, at least, section 10 of said act, the one under which these persons were appointed judges, is unconstitutional and void; and (3) the subject of *appointing* judges is not expressed in the title, and therefore it is so far void as being passed contrary to section 20, art. 4, of the constitution, which provides: "Every act shall embrace but one subject, and matters properly connected therewith, which subject shall be expressed in the title," and declares that, as to any subject not so expressed, the act shall be void; and that, therefore, the persons appointed under said act as judges were not judges, but intruders and usurpers, and the petitioner is in custody and adjudged to die without due process of law. What is due process of law, or the want of it, under the fourteenth amendment may, in some cases, be a difficult question to answer. The power conferred upon the United States to relieve against the acts of the state on this account was not intended to reach mere errors or defects in a proceeding, but only extends to cases in which there has been a palpable and substantial disregard of the law applicable thereto. For instance, the constitution of this state (section 11, art. 1) guaranties to a defendant in a criminal action the right of trial by jury. Now, if the legislature should provide that a certain person or class of persons who were obnoxious to the public should be tried without a jury, there can be no doubt that a conviction under such an act would be without due process of law, and the party affected by it might be relieved from it by the power of the United States.

Chancellor Kent, in his Commentaries, (vol. 1, p. 612,) says: "The better and larger definition of *due process of law* is that it means law in its regular course of administration through courts of justice."

Since the adoption of the fourteenth amendment two cases have been before the supreme court of the United States involving this question.

The first was *Kennard* v. *Louisiana,* 92 U. S. 481. There was a contest between Kennard and Morgan for a state judge-

ship in Louisiana, and the plaintiff in error appealed from the decision of the supreme court of the state, giving the office to Morgan, on the ground that it was without due process of law. The chief justice, in announcing the decision of the court, said that the only question in the case for its consideration was whether the state of Louisiana, acting through her judiciary, had deprived Kennard of his office without due process of law, and then said: "It is substantially admitted by counsel in the argument that such is not the case, if it has been done 'in the due course of legal proceedings,' according to those rules and forms which have been established for the protection of private rights. We accept this as a sufficient definition of the term 'due process of law,' for the purposes of the present case. The question before us is not whether the court below, having jurisdiction of the case and the parties, have followed the law, but whether the law, if followed, would have furnished Kennard the protection guarantied by the constitution. Irregularities and mere errors in the proceedings can only be corrected in the state courts. *Our authority does not extend beyond an examination of the power of the courts to proceed at all.* The judgment of the state court was affirmed.

The second was *Pennoyer* v. *Neff*, 95 U. S. 723. This case went up from this court, and the question was as to the validity of a personal judgment given against a non-resident of the state, in a court of the state, without any service of the summons except by publication. In delivering the opinion of the court, Mr. Justice Field said: "Since the adoption of the fourteenth amendment to the federal constitution the validity of such judgments may be directly questioned, and their enforcement in the state resisted, on the ground that proceedings in a court of justice to determine the personal rights and obligations of parties, over whom that court has no jurisdiction, do not constitute due process of law. Whatever difficulty may be experienced in giving to those terms a definition which will embrace every permissible exertion of power affecting private rights, and exclude such as is forbidden, there can be no doubt of their meaning when applied

to judicial proceedings. They then mean a course of legal proceedings according to those rules and principles which have been established in our jurisprudence for the protection and enforcement of private rights. To give such proceedings any validity, there must be a tribunal competent by its constitution—that is, by the law of its creation—to pass upon the subject-matter of the suit; and, if that involves merely a determination of the personal liability of the defendant, he must be brought within its jurisdiction by service of process within the state, or his voluntary appearance."

In considering this case I have not found it necessary to pass upon the constitutionality of the act of October 17, 1878, or the validity of the appointments thereunder; for although the act may be unconstitutional, and the appointments illegal, still if the persons appointed were judges *de facto*, their acts, as to third persons, are valid, and the petitioner is not restrained without due process of law. From the provisions of the constitution above cited it plainly appears that the supreme and circuit courts of the state are created by the constitution. They exist by virtue of its provisions. As therein provided, the judges of the former are the judges of the latter, until the legislature, in the exercise of the power conferred upon it by section 10, art. 7, provides for the election of distinct judges for the latter. The persons appointed as judges under this act, although its unconstitutionality be admitted, and that therefore they are not judges *de jure* or of right, are, nevertheless, acting as judges of constitutionally created and existing courts, having jurisdiction to try, hear, and determine the criminal action in which the petitioner has been convicted of murder, and sentenced to receive the punishment of death when and as it took place, both in the court below and upon appeal. A person actually in office by color of right or title—not a mere usurper or intruder—although not legally appointed or elected thereto, or qualified to hold the same, is still an officer *de facto*, or in fact, and, as a matter of public convenience and utility, his acts, while so in office, are held valid and binding as to third persons.

But counsel for the petitioner contend: (1) That no one is

an officer *de facto* who enters upon or holds an office under a void law or illegal appointment, but that he is only an intruder; (2) that to make one an officer *de facto* he must appear to have entered upon the office under a legal election or appointment—under color of right; (3) that a person cannot be considered an officer *de facto* unless the office he is said to be in legally exists; and there being no such office as "circuit judge" or judge of the circuit court established by the constitution, the person who acted as judge on the trial of the petitioner in the court below was not even a *de facto* judge; and (4) that an appointment cannot give color of right to enter and hold an office which is elective, and *vice versa*, and therefore the person who acted as judge of the circuit court in which the petition was tried was not a judge *de facto*. Upon the latter point council cite *People* v. *Kelsey*, 34 Cal. 475; *People* v. *Albertson*, 8 How. P. R. 363; *Brown* v. *Blake*, 49 Barb. 9.

In the first of these cases the court held that the constitution of the state having made the office of tax collector elective, the legislature had no power to provide for its being filled by appointment, nor to confer the duties thereof upon an office filled by appointment. But there the question arose in a direct proceeding to try the right to an office, while here it arises in a collateral one to determine the legality of an act done by a person while in office. Upon the question of the power of the governor to appoint a judge, when the constitution only provides for his election, it is in point. But it has no bearing upon the question whether a person so appointed is a judge *de facto* or not.

The second case is a direct authority for the proposition that "an officer *de facto* is one who acts under color of title, which color can only be given by power having authority to fill the office;" in other words, that an appointment to an *elective* office does not give color of title to the appointee, and *vice versa*. The opinion is plausible; but no authorities are cited, and, so far as appears, the distinction attempted to be made by it is not found in the books. The case was decided in the county court, and the opinion delivered by the county

judge. The last case also held that the legislature could not fill an elective office by appointment so as to give the incumbent color of right and make him an officer *de facto,* and therefore it discharged a party on *habeas corpus* from arrest, where the warrant was issued by a police judge, elected by the trustees of a village, who were themselves appointed to office when the constitution provided for their election. The opinion given by the judge who heard the matter at the special term cites no authorities, and it was affirmed at the general term without an opinion.

As to the third point, it is sufficient to say that the constitution in effect creates a circuit court in each county, to be held by a justice of the supreme court or a circuit judge, as the case may be, and such court is the *office* of the judge who holds it. A circuit judge's office is the circuit court in which he sits—the *place* which he fills—and such is the place or office filled by the person who acted as judge upon the trial of the petitioner.

The first and second points cover the general question, what constitutes a person an officer *de facto?* In *The King* v. *The Corporation of the Bedford Level,* 6 East, 356, Lord Ellenborough, citing 1 Lord Raymond, 660, said: "An officer *de facto* is one who has the reputation of being the officer he assumes to be, and yet is not a good officer in point of law."

In this case it was held that a *deputy* registrar who continued to perform the duties of registrar after the death of his principal was not registrar *de facto,* because he entered only as deputy and could not, therefore, acquire the reputation of registrar.

In *Wilcox* v. *Smith,* 5 Wend. 232, it was held that a person who had acted as justice of the peace for three years, with the reputation of being such justice, was presumably in office under color of an election, and therefore an officer *de facto,* although there was no direct evidence that he entered the office under color of an election. In delivering the opinion of the court, *Sutherland,* J., said: "The principle is well settled that the acts of officers *de facto* are as valid and effectual,

when they concern the public or the rights of third persons, as though they were officers *de jure*. The affairs of society cannot be carried on upon any other principle. * * * It will be observed that the cases do not go upon the ground that the claim by an individual to be a public officer, and his acting as such, is merely *prima facie* evidence that he is an officer *de jure*, but the principle they establish is this: that an individual coming into office by color of an election or appointment is an officer *de facto*, and his acts in relation to the public or third persons are valid until he is removed, although it be conceded that his election or appointment was illegal. His title shall not be inquired into. The mere claim to be a public officer, and the performance of a single or even a number of acts in that character, would not perhaps constitute an individual an officer *de facto*. There must be some color of an election or appointment, or an exercise of the office, and an acquiescence on the part of the public for a length of time, which would afford a strong presumption of at least a colorable election or appointment."

In *People* v. *White*, 24 Wend. 539, Mr. Chancellor Walworth said: "An officer *de facto* is one who comes into a legal and constitutional office by color of a legal appointment or election to that office; and, as the duties of the office must be discharged by some one for the benefit of the public, the law does not require third persons, at their peril, to ascertain whether such officer has been properly elected or appointed before they submit themselves to his authority, or call upon him to perform official acts which it is necessary should be performed. Thus, for instance, the constitution requires that the justices of the supreme court shall be appointed by the governor, with the advice and consent of the senate; but if, either intentionally or from inadvertence, the governor should appoint and commission an individual as one of the justices of that court without having previously nominated him to the senate and obtained the consent of that body, and the person thus appointed should take upon himself the duties of that office, he would be a judge of the supreme

court *de facto*, although, upon a *quo warranto*, he might be removed from the office to which he had not been legally and constitutionally appointed, and his official acts while he was such judge *de facto* would be valid as to third persons, so that this court, upon a writ of error brought for the purpose of reversing a judgment pronounced by him as such judge *de facto* of that court, would not be authorized to inquire as to the validity of his appointment. The result would be the same when his appointment had been made with the consent of the senate, in case he was constitutionally ineligible in consequence of his being a minister of the gospel."

To the same effect are the cases of *People* v. *Collins*, 7 John. 549; *McInstry* v. *Tanner*, 9 John. 135. In the latter, a person in the office of justice of the peace was held to be an officer *de facto*, although he was a minister of the gospel, and therefore constitutionally ineligible.

In *Mallet* v. *Uncle Sam, etc.*, 1 Nev. 188, it was held that a person acting as justice of the peace under an appointment by selectmen, who had no authority to make such appointment, and a commission from the governor, who was authorized to issue commissions to such officers, was a justice *de facto*.

In February, 1812, the legislature of Massachusetts created the county of Hampden, and provided that the act should not take effect until August. In the meantime the governor of the state assumed to appoint the officers for the new county, as he was authorized to do after the law took effect. The matter came before the court, and it was held that the appointments were void as being made without law, but that the appointees, while in office, were officers *de facto*, and their acts valid. See *Fowler* v. *Beleu*, 9 Mass. 231; *Commonwealth* v. *Fowler*, 10 Mass. 290.

In *Plymouth* v. *Painter*, 71 Conn. 587, it was held that "an officer *de facto* is one who executes the duties of an office under color of an appointment or election to that office. He differs on the one hand from a mere usurper of an office, who undertakes to act as an officer without any color of right, and

on the other from an officer *de jure,* who is in all respects legally appointed and qualified to exercise the office."

In *Brown* v. *O'Connell,* 36 Conn. 451, an officer *de facto* was defined to be "one who has the color of right or title to the office he exercises,—one who has the apparent title of an officer *de jure;*" and in *Brown* v. *Lunt,* 37 Maine, 428, as "one who actually performs the duty of an office with apparent right, and under claim and color of an appointment or an election."

*Ex parte Strang,* 21 Ohio St. 610, is a case directly in point, and decides expressly what some of the foregoing cases do by necessary implication, that an unconstitutional act will give color of right to an appointment made under it. The case was this: A statute authorized the mayor of Cincinnati, in the absence or disability of the police judge, to appoint a temporary substitute. In pursuance of this authority the mayor made such an appointment, who, in the discharge of the duties of the office, committed Strang to prison for the non-payment of a fine. The prisoner sued out a *habeas corpus,* and on the argument it was claimed in his behalf that the statute was contrary to the constitution and void. The court held that, admitting the act to be void, yet the appointee of the mayor was a judge *de facto,* saying: "The direct question in this case is whether the reputed or colorable authority required to constitute an officer *de facto* can be derived from an unconstitutional statute. The claim that it cannot seems to be based upon the idea that such authority can only emanate from a person or body legally competent to invest the officer with a *good title* to the office. We do not understand the principle to be so limited. We find no authorities maintaining such limitation, while we find a number holding the contrary. 9 Mass. 231; 10 Mass. 290. The true doctrine seems to be, that it is sufficient if the officer holds the office under some power having color of authority to appoint; and *that a statute, though it should be found repugnant to the constitution, will give such color.*" In support of this conclusion the court cites *Taylor* v. *Skrine,* 3 Brevard, 516; *Brown* v. *O'Connell,* 36 Conn. 432; *The State* v. *Mess-*

*more,* 14 Wis. 164; *The State* v. *Bloom,* 17 Wis. 521; in all of which it appears that an unconstitutional statute was held sufficient to give color of right or authority to an appointment to a judicial office, and the acts of such appointees, while in office thereunder, were held valid.

No decision of the supreme court of this state upon the question has been cited, and I am not advised that any exists.

Thus it will be seen that the almost unbroken current of authority is against the claim made for the petitioner, that no one can be an officer *de facto* under a void law or an illegal appointment; and, admitting that the judges who tried and heard the action against the petitioner in the state courts were appointed judges of those courts under an unconstitutional act, yet they were at the least such judges under color of right and authority, and therefore they were and are judges *de facto,* and their acts are valid and binding as to third persons.

Color of title to an office is analogous to color of title to land. The latter does not mean a good title, or even a defective conveyance from one having title, but only the appearance of title; that is, a deed to the premises in due form of law. *Stark* v. *Starr,* 1 Sawy. 20.

In conclusion, it appearing that the petitioner has been convicted of the offence charged against him in a court having jurisdiction of the subject-matter and the person, held by at least a *de facto* judge, he is not, so far as this court can inquire, restrained of his liberty or adjudged to lose his life without due process of law, and therefore the petition for the writ is denied.