[Civ. No. 2047.   Fourth Appellate District.—October 4, 1937.]

ALEX M. LESEM, Petitioner, v. R. W. GETTY, as Auditor, etc., et al., Respondents.

58

Stearns, Luce, Forward & Swing, Albert J. Lee and Adam and Renwick Thompson for Petitioner.

Thomas Whelan, District Attorney, William A. Glen, Chief Deputy District Attorney, and Carroll H. Smith, Deputy District Attorney, for Respondents.

MARKS, J.—San Diego County is organized and operating under a charter. (Stats. 1933, p. 2814.) Petitioner is a duly licensed and practicing physician and has been and is performing the duties of health officer or director of public health and sanitation of San Diego County. He is also director of public health of the city of San Diego and is performing the duties of health officer in several of the smaller municipalities of the county. On January 5, 1934, the state registrar of vital statistics appointed him local registar of vital statistics

for the term ending January 5, 1938; for registration districts number 3701 (city of San Diego), number 3703 (National City) and number 3763 (rural San Diego County). Since his appointment he has been performing his duties under it. Between January 1 and March 1, 1937, there became due $413.75 in fees under the terms of the Vital Statistics Act (Stats. 1915, p. 575) for services rendered by him as local registrar. On the last day of March, 1937, the state registrar of vital statistics certified the amount to respondent R. W. Getty, as auditor of the county of San Diego and petitioner made demand for a warrant in payment of this bill. The demand was refused and this action followed to compel the auditor to draw the warrant and respondent Will S. Heller as treasurer of the county of San Diego to pay it.

For performing the duties of director of public health of San Diego city petitioner. receives $162.50 monthly and for serving as health officer of La Mesa $50 monthly, of Oceanside $25 monthly and of National City $50 monthly. As these amounts were received by him he paid them into the treasury of the county of San Diego. He received $450 monthly from the county in payment of his services as director of public health and sanitation.

Petitioner seeks to establish his right to receive and retain the fees as local registrar of vital statistics by an ingenious theory which is strongly and ably supported in the briefs of his counsel. He maintains that he is the regularly appointed, qualified and acting director of public health (health officer) of the city of San Diego. This is not seriously disputed. He further maintains that he is not lawfully the director of public health and sanitation (health officer) of the county of San Diego; that his appointment as local registrar of vital statistics could not have been because of the services he was rendering the county but because of his position with the city; that, therefore, the county had no interest in or right to claim the fees for his services to the state. He further argues that if he be considered the *de facto* director of public health and sanitation (health officer) of the county of San Diego his appointment by the state was to a separate office or employment; that his compensation for such services was under authority of a state employment and in payment for services rendered the state; that it was separate and distinct

from his employment by the county of San Diego; that the county had no legal power or authority to require payment to it of his fees as local registrar which were earned by him under an office or employment by the state which was independent of any control by the county. A decision of the questions thus presented requires a careful consideration of constitutional and statutory provisions and of the charter and ordinances of the county of San Diego.

Counties derive their authority to adopt charters under the provisions of section 7½ of article XI of the Constitution. A county charter must provide for a board of supervisors and other officers described in subdivisions one to six inclusive, of the section, in none of which is a health officer or director of public health and sanitation mentioned. The section also provides:

"All charters framed under the authority given by this section, in addition to the matters hereinabove specified, may provide as follows:

"For offices other than those required by the Constitution and laws of the state, or for the creation of any or all of such offices by boards of supervisors, for the election or appointment of persons to fill such offices, for the manner of such appointment, for the times at which and the terms for which such persons shall be so elected or appointed, and for their compensation, or for the fixing of such compensation by boards of supervisors."

In considering the effect to be given and the interpretation to be placed upon the provisions of section 7½ of article XI of the Constitution we should bear in mind the clear statement in *Reuter* v. *Board of Supervisors*, 220 Cal. 314, at p. 326 [30 Pac. (2d) 417], as follows:

"The general purpose of section 7½ of article XI of the Constitution was to give local self-government or county home rule to counties of the state by means of charters framed under said constitutional amendment. That this was the intent and purpose of the section clearly appears from the language of the section itself, which declares that, after the charter has been approved by the legislature 'such charter shall become the charter of such county and shall become the organic law thereof relative to the matters therein provided . . . and shall supersede all laws inconsistent with

such charter relative to the matters provided in such charter'. In the arguments prepared in support of said constitutional amendment and sent to the voters of the state immediately preceding the election at which the amendment was adopted it was said, among other things: 'This proposal to amend the organic law occupying the second place on the official ballot for the ensuing special election on constitutional amendments, known as the "County Home Rule Amendment", is a logical growth from the successful administration of "Charter cities" formed under the "Home Rule" provisions of our constitution relating to municipalities.' Continuing the arguments, it is expressly stated that 'The main object of this amendment is to place the local government of each county in the hands of its citizens—in other words it is designed to give "home rule" to counties.' . . .

"The people of the state in the adoption of this amendment had good cause to believe, and evidently did believe, that they were thereby providing a means whereby they might have home rule in their local and county affairs, including the right, in the words of the amendment, to provide for the powers and duties of their county officers. The amendment as adopted by them, when construed as a whole, is not only susceptible of such a construction, but cannot be given any other reasonable interpretation."

It should be further observed that in the same case the following clause in subdivision four of the section, which "provided, that the provisions of such charters relating to the powers and duties of boards of supervisors and all other county officers shall be subject to and controlled by general laws", was held repugnant to the general purposes of the section and in conflict with them. It was the conclusion of the court that it should be disregarded. (See, also, *Mapes* v. *Williams*, 2 Cal. (2d) 177 [39 Pac. (2d) 421]; *County of Tehama* v. *Winter*, 56 Cal. App. 341 [205 Pac. 97]; *Simpson* v. *Payne*, 79 Cal. App. 780 [251 Pac. 324]; *Pullen* v. *Garrison*, 85 Cal. App. 706 [259 Pac. 1021]; *Wilkinson* v. *Lund*, 102 Cal. App. 767 [283 Pac. 385].)

Sections 13 and 14, article IV, of the county charter provide for the elective and appointive officers of the county. There is no health officer or director of public health and sanitation listed among them.

Article III of the charter defines the general powers of the the board of supervisors. Among them are the following:

"(a) To appoint or to provide for appointment, by ordinance, unless otherwise provided by this charter, all County or Township officers other than elective officers, and all officers, assistants, deputies, clerks and employees whose appointment is not specifically provided for by this Charter. . . .

"(e) To establish, by ordinance, as public necessity may require, offices other than those required by the Constitution and the laws of the State, and provide for the appointment of persons to fill the same, and fix the compensation therefor. . . .

"(g) To establish and adopt, by ordinance, a complete Administrative Code which shall be the rules and regulations pertaining to and prescribing in detail the duties and systems of office, institutional and departmental management, accounts and reports for each of the offices, institutions and departments of the county, all of which rules shall not be inconsistent with general law and the provisions of this Charter."

Section 37 of article VII of the charter contains the following provision:

"All County and Township officers, employees, boards and commissions by whom fees are collected for the performance of official duties, or otherwise, and all officers or employees collecting or receiving moneys pertaining to or for the use of the County, shall pay or transmit all such fees and moneys, without deduction therefrom, into the County Treasury, daily, and shall thereupon be credited by the Treasurer and Auditor with the amount so paid."

On November 13, 1933, the board of supervisors of San Diego County adopted an administrative code for the county. Rule C of section 7 of this code provides as follows:

"Said Board shall appoint a County Director of Health and Sanitation, subject to the approval of the Board of Supervisors, who shall be the executive officer thereof and who shall have charge of enforcing all County ordinances and State laws applicable and all regulations adopted by said Board pertaining to health and sanitary matters, and all orders, quarantine regulations and rules prescribed by the State Board of Health and all statutes pertaining to public health

and sanitation and vital statistics. Said County Director shall have general supervision over all hospitals and clinics utilized for isolation and for the treatment of communicable diseases and/or of child guidance clinics and/or any other clinics that may be established for the preventative treatment of physical or mental conditions insofar as is provided by County ordinances and California State law.''

Ordinance number 52, new series, effective for the fiscal year 1936–1937, fixed the compensation of the director of public health at $450 per month. Section 5 of that ordinance provided as follows:

''The salaries, wages, fees, mileage, compensation and expenses provided for herein shall be in full for all official services performed, and provided further, that all fees, mileage, expenses, commissions and compensation now or hereafter provided by law to be paid to any county or township officer either as such officer or as the agent of the State of California or any officer thereof, or as the agent of any political subdivision thereof, or of any officer of such political subdivision, for any official service or otherwise, except as herein otherwise provided, shall be paid into the county treasury as required by the Charter and Administrative Code, and placed to the credit of the general fund, unless some other fund is especially designated by law.''

Ordinance number 3, new series, adopted on July 3, 1933, created the department of public health of the county of San Diego under authority of and in almost the precise language of section 53 of article XI of the charter which gave the supervisors power so to do. It was provided that the department of public health be administered by a board of health. The minutes of a meeting of the board of health held on August 15, 1933, show that petitioner was then appointed director of health of San Diego County. On August 30, 1933, he was appointed director of public health of San Diego County by the board of supervisors. There seems to have been no subsequent appointment made, although petitioner has been performing his duties and drawing his salary from the county.

A fair construction of the constitutional provisions give a chartered city the right to create offices not provided for by law. Petitioner points out that section 4225 of the

Political Code empowers a board of supervisors to appoint a county health officer who shall be an employee of the county and not a county officer. From this he argues that as the general law provides for the filling of this position the supervisors have no right to create the office of director of public health or health officer.

As we have already seen, section 7½ of article XI of the Constitution was intended to permit counties to adopt a complete plan of home government and that the clause subjecting a board of supervisors to the control of general laws must be disregarded as in conflict with the general purposes of the section. (*Reuter* v. *Board of Supervisors, supra.*)

Under the authorities already cited this provision of section 4225 of the Political Code must be held to apply to unchartered counties and to be inoperative in chartered counties which, under authority of their charters, have provided for a health officer regardless of the particular title given him. The fact that there was a variance in the official title given to the office in the several legislative enactments can be given no weight here.

Petitioner points out that the charter became operative on July 1, 1933; that petitioner was appointed in August, 1933; that, assuming that the administrative code was sufficient to create the office of director of public health and sanitation, this ordinance was not passed until November 13, 1933. From this he argues that he was appointed to an office that did not exist and as there was no subsequent appointment he did not become director of public health and sanitation of the county.

A similar situation was before the Supreme Court in the case of *Buck* v. *City of Eureka,* 109 Cal. 504 [42 Pac. 243, 30 L. R. A. 409]. Certain sections of the Political Code were made part of the charter of the city of Eureka. They empowered the common council to create the office of city attorney which power was never used. However, Buck was appointed city attorney, acted as such officer and drew monthly compensation for his services. The Supreme Court was of the opinion that the charter gave the office of city attorney a potential existence sufficient for it to be filled by a *de facto* if not a *de jure* officer. The court cites with approval and discusses the rules laid down in the following cases: *In re*

*Ah Lee,* (D. C.) 5 Fed. 899 [6 Sawy. 410], *Carleton* v. *People,* 10 Mich. 250, *Yorty* v. *Paine,* 62 Wis. 154 [22 N. W. 137], and *Fowler* v. *Bebee,* 9 Mass. 231 [6 Am. Dec. 62]. In each of them it was held that where an officer was appointed before the law creating the office went into effect the appointee was a *de facto* officer. ▮▮▮ There seems to be a general rule running through many cases, except election contests, to the effect that the right to hold, occupy and enjoy a public office, where one is performing its duties, should be tried directly in *quo warranto* proceedings and not attacked collaterally.

On pages 515–517 of the Buck case it is said:

"The case of *Smith* v. *Lynch,* 29 Ohio St. 261, is nearly a parallel case with the one at bar. The legislature of Ohio authorized villages and towns to *establish* boards of health and appoint members. The village of West Cleveland, by a void ordinance, attempted to do this. The members appointed qualified, and entered upon the discharge of their duties, and were accepted and regarded by the public as such members. The opinion of the court, delivered by Welch, C. J., is as follows: 'The questions argued by counsel are: 1. Had the superior court jurisdiction? 2. Are the requirements of the statute as to the manner of passing the ordinance mandatory, or are they merely directory? 3. If these requirements are mandatory, are the persons so acting to be regarded as a board of health *de facto?* We are satisfied that the last named of these questions must be answered in the affirmative. It is unnecessary, therefore, to consider the first and second questions. In other words, we think that, under the circumstances, the board is to be regarded as a board *de facto.* Whether it was a board *de jure* and whether the superior court had jurisdiction of the case became, therefore, immaterial questions. It is claimed by counsel for the plaintiff that this is not a case where an office has been filled and its duties performed by the parties not legally appointed or qualified, but a case where *there was no office to be filled.* We do not so understand the law. The statute (60 Ohio Laws, 200) *creates the office.* It authorizes the council to "establish" the board, and to fill it by appointment. True, until the council act in the premises it is a mere potentiality in their hands; yet it is none the less an *office,* known to the law.

Where the council assume to establish the board under the law and to appoint its members, there is no good reason why an irregularity or illegality in the act of establishing the office any more than an irregularity or illegality in the appointment of the officers should be held as rendering the acts of the officers void, and themselves mere trespassers. The reasons—the considerations of public policy—which exist in one case, exist equally in the other. It is enough that the office is one provided for by law, and that the parties have the color of appointment, assumed to be and act as such officers, and that they are accepted and acknowledged by the public as such to the exclusion of all others. Such was the case here. There was both the color and the fact of office.'

"The office under consideration (city attorney of Eureka) was given a potential existence by the acts of the legislature in the sections of the code above quoted. The plaintiff having accepted the appointment to it, and received the emoluments of it, is estopped from endeavoring to show to his own advantage that the council did not follow a prescribed mode in perfecting that potential existence."

Under the rule just announced, petitioner having been appointed director of public health and sanitation of San Diego County, having performed the duties of his office and accepted the emoluments from it, must be held to be *de facto* if not *de jure* director of public health and sanitation of San Diego County and estopped from denying either the legality of the creation of his office or of his appointment to it. (See, also, *Woodward* v. *Fruitvale Sanitary Dist.*, 99 Cal. 554 [34 Pac. 239].)

Petitioner contends that the attempt to create the office of director of public health and sanitation is void because the term of office and manner of appointment are not set forth in the charter as seems to be required in the already quoted portion of the Constitution. This is but another way of attacking the legality of the creation of the office and of his appointment to it. The doctrine of estoppel already considered is sufficient answer to this argument. A similar situation was before the court in the case of *Decker* v. *Board of Health Commrs.*, 6 Cal. App. (2d) 334 [44 Pac. (2d) 636], where a provision of the Los Angeles city charter was under consideration. The court said:

"The charter of the city of Los Angeles has no provision relative to the tenure of office of the health officer, hence the petitioner held office at the pleasure of the respondent, subject only to the charter limitations as to his removal, if any."

If we should assume, without holding, that petitioner comes within the classified service, his term of office would be fixed by the civil service regulations.

█ Petitioner urges that as the purpose of the administrative code was to provide for the conduct of the various offices of the county, it was not within its purport to create an office and that therefore its attempt to create the office of director of public health and sanitation should not be given any effect. We cannot agree with this reasoning. There is no requirement that an ordinance shall relate to but one subject or that its title should disclose all its purposes. (*Ex parte Young*, 154 Cal. 317 [97 Pac. 822, 22 L. R. A. (N. S.) 330]; *Ex parte Haskell*, 112 Cal. 412 [44 Pac. 725, 32 L. R. A. 527]; *Ex parte Yung*, 7 Cal. App. 440 [94 Pac. 594].) It follows that the administrative code, when lawfully enacted, created the office.

█ Petitioner's contention that he was serving the public in a dual capacity, one as local registrar of vital statistics under the state and the other as director of public health and sanitation under the county; that the offices held were separate and distinct; that neither employer could dictate to him the disposition of the money paid him by the other, cannot be sustained. He was appointed by the state because he was serving as health officer of the county of San Diego. After his earned fees were paid, it was no concern of the state what became of this money. On the other hand, it was part of his contract with the county of San Diego that all fees paid to him from all sources be paid into the county treasury. The county paid him $450 as compensation for his services and in payment for the surrender of these fees and the salaries from the municipalities. The supervisors had authority to fix his salary and he agreed to these terms by accepting the office. There would be a partial failure of consideration if he were permitted to retain these fees. The county kept its part of the contract and petitioner should be held to his covenant. He cannot expect performance by the county and violate his obligations under his contract.

The case of *San Francisco* v. *Mulcrevy,* 15 Cal. App. 11 [113 Pac. 339], is controlling here. Mulcrevy was county clerk of the city and county of San Francisco and *ex officio* clerk of the superior court. He collected fees in naturalization cases and laid claim to half of them under the same argument petitioner is making here. In holding that the fees must be paid into the treasury of the city and county of San Francisco it was said:

"The charter having expressly provided a salary for the county clerk, and a salary for his many assistants, deputies and copyists, states that such salary shall be 'full compensation for all services rendered, and every officer shall pay all moneys coming into his hands as such officer, no matter from what source derived or received, into the treasury of the city and county of San Francisco within twenty-four hours after receipt of the same'. The money came into the hands of Mulcrevy as such clerk, although the source from which it was derived and received was the amounts paid to him as fees in naturalization proceedings as prescribed and provided for in the act of Congress; and it was his duty to pay it into the treasury of the city and county. Language could not be more explicit. It does not admit of doubt or quibble as to its meaning. 'No matter from what source derived' means all the money coming into his hands by virtue of and by reason of his being such county clerk and *ex officio* clerk of the superior court. It was by reason of his election as county clerk and his taking office and giving his bond, and receiving a salary of $4,000 per annum, that he was enabled to receive the fees for naturalization proceedings in the superior court. He received them in his official capacity. He was *ex officio* clerk of the superior court in which the fees were collected under the provisions of the act of Congress. The act authorized him to retain one-half the fees collected by him; but as to what he was to do with such half so retained did not concern the United States government, but was a matter solely between himself and the city and county of San Francisco. It was his duty to receive and file complaints, answers, pleadings, petitions in probate, and perform all services required of him, for which he received fees. It was his duty to perform all services required of him by the laws of the state at the time he took office, and all services that might be

required of him by any subsequent law of the state enacted after his accession to office. Such fees were not his, but belonged to the city and county, he being in one sense the agent of the city and county in collecting such fees. It was equally his duty to perform services in naturalization proceedings after the passage of the law subsequently enacted by Congress, and to receive fees for such services, but the fees when so received belonged to the city and county of San Francisco. It was not for him to say that the services were performed under the authority of the United States, and not under the authority of the state.''

A petition for hearing in the Supreme Court was denied and the case went to the Supreme Court of the United States. (*Mulcrevy* v. *San Francisco*, 231 U. S. 669 [34 Sup. Ct. 260, 58 L. Ed. 425].) In upholding the decision of the District Court of Appeal the Supreme Court of the United States said:

''But it is contended by plaintiffs in error that the fees having been received officially is not of importance, that nevertheless he acted as the representative of the United States, in execution of the policies of the United States, and being by the act of Congress invested with his powers, he is entitled for himself to the compensation prescribed by the act for their execution, without any liability to account for them to the city. The last proposition, however, does not follow from the others, and the others are but confusing. If it be granted that he was made an agent of the national government, his relations to the city were not thereby changed. He was still its officer, receiving fees because he was,—not earning them otherwise or receiving them otherwise, but under compact with the city to pay them into the city treasury within twenty-four hours after their receipt.

''Under the contention of plaintiffs in error a rather curious situation is presented. Mulcrevy was elected to an office constituted by the municipality under the authority of the state. He was given a fixed salary of $4,000 with the express limitation that it should be his complete compensation. He agreed that all other moneys received by him officially should be paid into the treasury of the city. He was given office accommodations, clerks to assist him, and yet contends that notwithstanding such equipment and assistance, notwith-

standing his compact, he may retain part of the revenues of his office as fees for his own personal use. We cannot yield to the contention.''

(See, also, *County of Los Angeles* v. *Cline,* 37 Cal. App. 607 [174 Pac. 73] ; *Los Angeles County* v. *Cline,* 185 Cal. 299 [197 Pac. 67] ; *County of Alameda* v. *Cook,* 32 Cal. App. 165 [162 Pac. 405].)

To support his contention, petitioner relies upon the cases of *Boss* v. *Lewis,* 33 Cal. App. 792 [166 Pac. 843], and *Sacramento* v. *Simmons,* 66 Cal. App. 18 [225 Pac. 36].

The Boss case is of no assistance to him. There was involved no provision of a city or county charter. The court merely held that the state could require a county to pay fees of a local registrar of vital statistics out of the county treasury.

The Simmons case involved the right of a city officer, acting as city health officer, to retain for his own use fees earned as local registrar of vital statistics. It turned on the construction put on provisions of the charter of Sacramento. The court was of the conclusion that ''there was nothing in the city charter during the period involved in these proceedings or in the general laws of the state which required the defendant to turn over to the city treasurer of the city of Sacramento compensation collected by him from the county of Sacramento through the agency of the state of California for discharging the duties of local registrar of vital statistics for the state of California''. In that respect the charter of Sacramento differed from the charter of San Diego County, which provided that all fees *"collected for the performance of official duties or otherwise"* be paid into the county treasury. This language is broad and all-inclusive. In order to support petitioner's position we would have to disregard the words ''or otherwise'', as contained in the charter provision. This we cannot do.

Respondents have demurred to the petition. As we have considered the case on its merits the demurrer is overruled.

The peremptory writ of mandate is denied and the alternative writ is discharged.

Barnard, P. J., and Jennings, J., concurred.

An application by petitioner to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 2, 1937.